JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLY ODD, <br><br> Plaintiff, <br><br> v. <br><br> DELTA AIR LINES, INC., a corporation; DELTA FAMILY-CARE DISABILITY AND SURVIVORSHIP PLAN, an ERISA plan; DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:18-cv-02523-WDK-MRW <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL** |

## A.  FINDINGS OF FACT

1.  The Delta Family Care Disability and Survivorship Plan ("Plan") is an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq*. ("ERISA") (1943) that is administered in Atlanta, GA (2100).[1]

---

[1] The administrative claim file has been jointly lodged with the Court under seal and is labelled Delta-Odd 000001-1941. A copy of the Plan is filed as Exhibit A to the Declaration of Connie Schultz, and labelled Delta-Odd 001942-2028. The Summary

2. The Plan provides, among other things, short-term and long-term disability benefits to eligible participants who are Delta Air Lines, Inc. ("Delta") employees. (1943).

3. The Plan provides short-term disability benefits, usually for up to six months, so long as a Plan participant generally cannot perform their customary occupation as a result of demonstrable injury or disease as those terms are defined by the Plan. (1959).

4. If a participant is still unable to work after exhausting these benefits, she can then seek long-term disability benefits that are initially available according to the same substantive standard, as long as she also can show a loss of at least 20% of her earning capacity as measured by the participant's prior wages. (Id.).

5. After the first six months of long-term disability eligibility, the Plan states that to be disabled during this period the claimant must show:
> the inability of an Employee to perform any Gainful Occupation as a result of a demonstrable injury or disease (including mental or nervous disorders and occupational injuries and illnesses) or pregnancy. A Gainful Occupation is an occupation (1) for which the Employee is, or may become, qualified by reason of education, training or experience and (2) for which the potential for earnings is expected to be 50% . . . or less of the Employee's Pre-Disability Earnings.

(1959).

6. A claimant could elect prior to the onset of a disability to have this 50% threshold set at 60%, but Plaintiff did not make this election. (0027, 2045).

7. Plaintiff received short-term disability benefits and then long-term disability

---

Plan Description is attached as Exhibit B to the Schultz Declaration and is labelled Delta-Odd 002029-2113 (cites to these documents in this brief are made without reference to the prefix as it is common to all of them and omits the first two zeros as they are never used in the record).

2

|   |   |
|---|---|
| 1 | benefits for more than six months, so the Gainful Occupation Standard could |
| 2 | have been applied to Ms. Odd as early as August of 2016 (0208) (showing |
| 3 | approval for long-term disability benefits for over nine months from February |
| 4 | 8, 2016 to November 15, 2016). |

8. The Plan's administrator is the Administrative Committee of Delta (1990) which administers to the Plan in Atlanta, Georgia (2100).

9. Section 12.02(b) of the Plan gives the Administrative Committee:

> [t]he discretionary authority to interpret and construe the terms of the Plan, and decide all questions of eligibility of any employee, Eligible Family Member, or Beneficiary to participate in the Plan, or to receive benefits under it, its interpretations and decisions thereof to be final and conclusive.

(1990).

10. The Administrative Committee also has the power to "delegate its power and duties as set forth to decide these claims." (1990-92 (citing Sections 12.02(h) and 12.04)).

11. The Administrative Committee has delegated decisions regarding the continuing qualification for long-term disability benefits to the Plan's Claims Administrator, Sedgwick. (1945 (Section 1.11), 1967 (Section 4.05), 2089, 2094, 2100).

12. If a participant is unhappy with Sedgwick's decision, the participant can appeal that decision. (1982-83).

13. The participant is permitted to submit evidence and argument in support of the appeal in writing. (Id.).

14. If that appeal is unsuccessful, the claimant can seek a second appeal. (1983).

15. To the extent that there is any contention that there was a conflict of interest that somehow affects the decision, that contention needs to be made in the claims process or it is waived. (1984).

16. Any long-term disability benefit award under the Plan is subject to offset of various other benefits or amounts that the participant may receive. For example, all of the disability benefits that any participant may receive from the Social Security Administration are to be offset against any benefit received under this Plan. (1972).

17. Further, the participant is required to notify Sedgwick of any third-party claim that relates to the injury that is the alleged cause of the disability within 31 days of making the third-party claim. (1989 (incorporates subrogation and right of recovery terms from the SPD) & 2084 (SPD right of recovery provisions)).

18. The Plan is entitled to recover from the third-party settlement an amount up to the amount of benefits provided under the Plan regardless of how Plaintiff may characterize the terms of that settlement (whether for medical losses, wages losses or otherwise). (2083).

19. To the extent a participant does not provide timely notice of such a resolution, she is subject to complete disqualification from all benefits under the Plan. (2084).

20. In the unlikely event that some issue arose under the Plan that was not preempted by ERISA, Georgia law would apply to all participants. (1996).

21. The Plan states that all claims will be decided under ERISA as that law would be applied as if the matter were brought in the jurisdiction of the United States Court of Appeals for the Eleventh Circuit regardless of where the case is filed. (1996-97). The Plan is administered by the Administrative Committee within that jurisdiction. (2100).

22. The structure of the Plan calls for all of the benefits to be paid out of an irrevocable trust that is administered by the Administrative Committee, the named fiduciary for the Plan. (1988 (Section 11.04)). The Plan has separated the responsibility for the payment of benefits (by the Administrative

4

Committee) from the decision on eligibility for benefits (by Sedgwick), thus eliminating any structural conflict of interest.

23. Plaintiff was injured in an automobile accident and began a leave from work on August 8, 2015 (0208).

24. According to the terms of the Plan, the applicable standard that applied to her claim changed from the Customary Occupation to the Gainful Occupation standard on or about August 8, 2016. (1959).

25. Sedgwick called Plaintiff and explained this change to her personally even though there is no requirement under ERISA that such a call be made. (1820).

26. Despite claiming to be seriously injured, Plaintiff did not see her treating physician for six weeks between September 1, 2015 and October 20, 2015. (1787). Plaintiff later admitted in May of 2016 that she stopped physical therapy "a long time ago." (1820).

27. Plaintiff claimed that she was disabled due to "upper back/neck pain [and] headaches." (0029).

28. Ms. Odd's long-term disability benefits under the Plan ultimately were approved through December 1, 2016 at a rate of $2,686.50 per month. (0027).

29. The information that Sedgwick had at that time included a physical evaluation form completed by her own physician, Dr. Ojen Masrour, indicating that Plaintiff could return to work 6 hours a day, 30 hours a week as of July 29, 2016, but that she would not be able to work without restrictions. (0092-93).

30. It also included information from Ms. Odd's chiropractor, Dr. Phillip Lewis, who indicated on August 12, 2016 that she could return to work up to 40 hours per week as of January 1, 2017 with some unstated restrictions, and with no restrictions as of June 1, 2017. (0128-30).

31. Plaintiff's treating physician, Dr. Masrour, recommended Plaintiff see a pain management specialist. (1828). Plaintiff, instead, went to see Dr. Lewis, a

|   |     | chiropractor. (1883). |
|---|-----|---|

32. In part due to the absence of treatment and the relative lack of information from her chiropractor (1836), Sedgwick contracted with GENEX Services, LLC to have Plaintiff seen by a neurologist. (0171).

33. GENEX selected Dr. Robert J. Shorr on September 29, 2016, a Diplomate in Neurology of the American Board of Psychiatry and Neurology. (0171-196).

34. When seen by Dr. Shorr on September 29, 2016, Plaintiff complained of mild to moderate headaches that did not interfere with her concentration, but were associated with her neck pain that she also described as mild to moderate. (0172-74).

35. Dr. Shorr included two pages of observations in his physical examination and neurological examination of the Plaintiff (as indicated in part by the examination of her eyes), that had no remarkable findings. (0178-79).

36. Dr. Shorr spent an additional six pages reviewing the prior medical records that had been given to him. After examining Plaintiff, Dr. Shorr concluded that he could not find any evidence of disability other than her self-reported pain. (0180-86).

37. After considering all of this information, Dr. Shorr noted that Plaintiff did self-report symptoms of headaches, but there were no clinical findings to support the report of pain, and that she did not have "disabling symptoms or medical findings preventing her from performing normal job duties." (0188).

38. Dr. Shorr concluded that:

> All that is required at this time would be observation and a home-based exercise program with range-of-motion and strengthening and stretching exercise for the neck and upper back, along with judicious use of over-the-counter non-steroidal and anti-inflammatory medications such as Advil or Aleve. The claimant is not in need of active treatment at this time.

(0188).

39. Even though the applicable standard at the time was the any Gainful Occupation standard, Dr. Shorr specifically opined that Plaintiff could perform the job of flight attendant/steward after reviewing the job description for those duties. (0189).

40. Dr. Shorr reaffirmed these opinions after receiving additional medical records following his initial report. (0192-98). Dr. Shorr initially requested a nerve conduction study, and Sedgwick approved that request within 30 minutes even though the request was made while the Sedgwick employee who received it was at lunch. (0597-98 (the parties emailing were in two time zones, 1 hour offset)). Dr. Shorr did not think the test was significant enough to have Plaintiff wait for that approval. (Id. at 0597).

41. Sedgwick received and then sent Dr. Shorr's report to Dr. Masrour and Dr. Lewis, who were given 10 days to submit a response if they disagreed with these findings. (0208).

42. Neither doctor responded to the IME so Sedgwick proceeded on the assumption that both doctors were in agreement with Dr. Shorr's findings. (Id.).

43. Sedgwick unilaterally extended Plaintiff's long-term disability benefits through November 30, 2016 so they would not lapse during its review. (1856).

44. Based on the information at hand, Sedgwick then denied Plaintiff any benefits after December 1, 2016. (0207).

45. Sedgwick's letter set forth the standard for long-term disability benefits and, following a thorough review of the documents submitted, concluded that the medical evidence received to date did not support Plaintiff's inability to perform her job as a result of her condition. (0207-08). It specifically noted that:

- Dr. Shorr reviewed the MRI which showed no injuries resulting

7

from the auto accident;

- Dr. Shorr noted only mild tenderness in three areas and no neurological impairment; and
- Dr. Shorr concluded that Plaintiff could return to her job as a flight attendant.

(Id. at 0208.)

46. If anything, Sedgwick erred in favor of Plaintiff. Even though the applicable standard is the Gainful Occupation standard, it found that in light of the medical evidence, Plaintiff did not meet the Customary Occupation standard anymore. As the Gainful Occupation standard is harder to meet, Plaintiff would have failed that one as well. (1959).

47. Plaintiff then appealed on December 6, 2016, after securing counsel. (0257).

48. On December 6, 2016, Plaintiff's counsel requested the entire claim file and a copy of the Plan (0211). Sedgwick sent it to Plaintiff's counsel on December 16, 2016 (1864 (receipt) & 1868 (confirmation of shipment) & 0573 (package weighed three pounds)). In the ensuing communication, during the appeal, Plaintiff's counsel never asserted any documents were missing. (0551-52, 554, 559, 560, 562-63, 565, 567-68, 572).

49. On January 9, 2016, Sedgwick contacted Plaintiff's counsel alerting him to the fact that the Plan held a lien on the settlement of a tort claim that Plaintiff might bring relating to her accident. (0269) (The letter is dated January 9, 2016, but was actually sent on January 9, 2017 (1870)). According to the Administrative Record, Sedgwick received no response to this letter. (0001-1941).

50. On February 2, 2017, the United States Social Security Administration denied Plaintiff's claim for Social Security disability benefits. (0278-82).

51. On February 13, 2017, Sedgwick received a copy of this denial from one of its vendors. (1873). The denial letter concluded that "her condition is not severe

8

enough to be considered disabling." (0278).

52. The Social Security Administration also concluded that "[t]he [e]vidence does not show any other impairment which would significantly restrict her from performing work-related functions. Based upon the evidence, we have concluded that your condition should not limit your ability to work." (Id.). In short, the Social Security Administration reached a conclusion similar to Sedgwick.

53. Plaintiff tolled the appeal period repeatedly at Plaintiff's counsel's request (1880) for approximately five months before she submitted a letter from a new physician, Dr. Leon Barkodar, on May 1, 2017. (0303 & 0305).

54. The letter, only 9-lines long, includes no medical findings, no reference to any tests that were performed, and no indication of what work she could not perform other than simply saying that he does not believe that Ms. Odd can perform the job of an airline "stewardess." (0305).

55. Plaintiff did not state how long Dr. Barkodar's examination of Plaintiff lasted nor did she provide this information for any other physician she relied upon. (0001-0194).

56. Dr. Barkodar's opinion relies totally on Plaintiff's self-report of pain to substantiate her claim. (Id.).

57. At the same time, Plaintiff submitted statements of Plaintiff's family members (and her significant other) in support of her claim that she was unable to work. (0306-311). These statements were anecdotal by non-professionals, and not related to any medical or Plan criteria. (Id.).

58. After receiving the information submitted, Sedgwick then sought a peer review of Plaintiff's records and contracted with Dane Street LLC for such a review. (0318 & 0328-34).

59. Dane Street LLC referred the file for examination by Dr. David Hoenig, who

9

is Board Certified in Neurology and Pain Management. (0334).

60. After reviewing all of the documentation provided, the requirements of the flight attendant position, and unsuccessfully attempting to reach Dr. Barkodar by phone, in his May 24, 2017 report, Dr. Hoenig acknowledged the self-reported pain by Plaintiff and Dr. Barkodar's conclusory opinion, but noted that there is no clinical evidence supporting Ms. Odd's complaints or Dr. Barkodar's opinion. (0332 & 1893).

61. Specifically, Dr. Hoenig acknowledged the complaint, but noted that there was:

> no clinical documentation submitted for review by her treating neurologist. There is no documentation of neuro-diagnostic study submitted for review. There is documentation of a neurological IME. This independent assessment revealed no neurological deficits, and there are no neurologically based restrictions or limitations.

(0332).

62. In addition, Dr. Hoenig noted that there is no "clinical documentation from any treating provider, including a pain management specialist, providing a detailed history, and providing a detailed physical examination demonstrating abnormal pathology. There is no documentation of any significant diagnostic studies submitted for review demonstrating significant abnormal pathology." (Id.).

63. Thus, in the absence of any clinical findings to support the complaints by Plaintiff, Dr. Hoenig concluded that Plaintiff was not impaired at all from working. (0332-33).

64. Following the receipt of this information on May 30, 2017, Sedgwick denied Ms. Odd's appeal because of the relative lack of evidence supporting her claim that she could meet the Plan's standard for long-term disability. (0338-341). The letter specifically acknowledged the report of pain. (0339). It also pointed out the diagnoses by her neurologist and the various types of documentation that could be probative but were missing, including:

- clinical documentation by her treating neurologist; and
- documentation of neurodiagnostic studies.

(0339). The letter did note that the neurological IME showed no neurological deficits, or neurologically based restrictions or limitations (340). It also noted the absence of the same information Dr. Hoenig found lacking. (Compare 0340 with 0332).

65. In summarizing Plaintiff's further appeal options, and after previously sharing what specific types of documents were lacking as noted above, the letter advised Plaintiff that if she wished to appeal, she should "state the reason(s) you believe your claim was improperly denied. You may also submit additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your Appeal proper consideration." (0340).

66. The appeal was handled by a different person. The original claim was handled by reviewer "K Marks" and the appeal by Amy Greenwald. (1855, 1864).

67. Persuaded by Dr. Hoenig's conclusion and the lack of new medical information provided with the appeal, Sedgwick denied the appeal and noted that Plaintiff had the right to a second appeal. (Id.).

68. The decision letter also highlighted the relevant terms of the Plan and listed the information that was reviewed in making that decision. (0339-40).

69. Plaintiff at that time elected a further appeal under the terms of the Plan. The consideration of the appeal was tolled four times at Plaintiff's counsel's request. (1921).

70. On June 5, 2017, Plaintiff asked for a copy of the entire claim file. (0343).

71. Six days later, Sedgwick delivered five pounds of documents to Plaintiff's counsel. (0532-33).

72. At no time during the second appeal did Plaintiff's counsel assert he was

missing any documentation from either his request during the first appeal or this request. (0350-51, 0506, 0516, 1003-04, 1007-08, 1040, 1055-58, 1062-63, 1067-69, 1737-38).

73. Sedgwick had a different reviewer, Richie Marchand, handle the second appeal. (1980).

74. On November 14, 2017, Plaintiff submitted information from Dr. Vimal Lala and a supplemental letter and treatment notes from Dr. Barkodar. (1069).

75. Dr. Lala did diagnose the various conditions regarding Plaintiff's back. (1261).

76. Dr. Lala concluded that Plaintiff could not perform her job or "steady employment." (1262).

77. Dr. Barkodar's letter included observations of an MRI, but otherwise focused only on Plaintiff's self-report of pain. (1763).

78. Sedgwick contracted again with Dane Street LLC which enlisted two new peer reviewers: Dr. Leo Lombardo, a pain management specialist, and Dr. Michael Chilungu, a neurologist, to consider this information. (1751-57 & 1759-66).

79. Dr. Lombardo's December 11, 2017 report indicated that there were self-reports of pain but that they were inconsistent with the underlying pathology. (1751-57).

80. Specifically, Dr. Lombardo noted that "since the independent medical examination by Dr. Shorr, there was no note of interim clinical changes, new test findings, or other clinical rationale for new work restrictions or limitations." (1756).

81. Dr. Lombardo then addressed the testing performed by Dr. Lala and stated: "electrodiagnostic testing revealed only mild peripheral neuropathy. Ongoing complaints of headaches do not correlate with evidence of underlying pathology that would explain these headaches. The cervical MRI revealed only mild degenerative changes. The painful complaints are out of proportion to

mild underlying pathology." (1756).

82. Dr. Chilungu's peer review found that the findings in "the neurological physical examinations, at their worst, were modest abnormalities that are not likely to translate into any significant functional impairment." (1764).

83. Both Dr. Lombardo and Dr. Chilungu sought to speak with Plaintiff's physicians before making their decision. (1923-31).

84. Sedgwick's December 15, 2017 decision recognized the concerns that Dr. Lala, Dr. Lewis and Dr. Barkodar had, but noted that they were considered non-impairing by other physicians. Specifically, the letter detailed the findings of Dr. Lombardo and Dr. Chilungu to that effect. (1769-70). The letter specifically noted the complaints of pain. (1769-70). In denying her claim, the letter stated that Plaintiff had submitted "insufficient medical evidence" – of any type, objective or subjective – to substantiate an objective, clinical or demonstrable basis for disabling conditions that rendered Plaintiff functionally impaired from performing her customary occupation under the Plan. (1770). Thus, it did not insist on objective evidence. (1768). This is consistent with the evidence it relied upon. (1768-70). As a result, Sedgwick concluded that Plaintiff was not impaired from performing her customary occupation as defined under the terms of the Plan. (1769-70). Since Plaintiff could not meet this standard, even though Sedgwick did not have to apply it, she obviously could not meet the Gainful Occupation standard either. (1959).

85. Plaintiff did not appear to testify at trial.

86. Manuel Navarro did not appeal to testify at trial.

87. No testimony was offered at trial to provide a foundation for, or a basis of admissibility for, any evidence offered by Plaintiff outside of the administrative record.

///

13

# B. CONCLUSIONS OF LAW

1. Although Defendants argue the decision by Sedgwick should be considered as if it were brought in a court in the United States Court of Appeals for the Eleventh Circuit, Wang Labs v. Kagan, 990 F.2d 1126, 1129 (9th Cir. 1993) (upholding choice of law provision under ERISA as less burdensome than forum-selection provision); In re Mathias, 867 F.3d 727, 728 (7th Cir. 2017), cert denied, 138 S. Ct. 756 (2018) (upholding forum-selection provision under ERISA); Smith v. Aegon Companies Pension Plan, 769 F.3d 922 (6th Cir. 2014), the Court has indicated it need not do so because the law of the Eleventh and Ninth Circuits is effectively the same.

2. The language of the Plan is such that it reserves discretion for Sedgwick, as that discretion has been delegated by the Administrative Committee, to decide benefit claims under the Plan, such that the abuse of discretion standard of review applies to the decisions by Sedgwick under this Plan, including the one Plaintiff challenges. See Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 111 (1989) (citing Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 568 (1985)); Taft v. Equitable Life Ass. Soc'y, 9 F.3d 1469, 1471 (n.2 (9th Cir. 1993).

3. Given the structure of the Plan – that separates the decision maker from the payor – there is no structural conflict of interest affecting Sedgwick's decision. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117-18 (2008); Day v. AT&T, 698 F.3d 1091, 1096 (9th Cir. 2012).

4. In addition, considering the points that Plaintiff claims show some procedural irregularity, and the points that Defendants raise including those that show the additional time Plaintiff was given and that Sedgwick applied a standard more favorable than was called for, in total, the Court finds that Sedgwick did not act as a conflicted administrator even if the lack of a structural conflict is put to the

side.

5. With the evidence submitted to it in conflict, some of it supporting the decision by Sedgwick and some of it supporting the Plaintiff's claim, Sedgwick's denial of the final appeal was not an abuse of discretion under the Plan's Customary Occupation standard. <u>Jordan v. Northrop Grumman Corp. Welfare Plan</u>, 370 F.3d 869, 880 (9th Cir. 2004) (upholding denial in the face of conflicting evidence); <u>Jebian v. Hewlett-Packard</u>, 344 F.3d 1098, 1110 (9th Cir. 2003) (on deferential review, review is limited to the administrative record). While Plaintiff has claimed that <u>Jordan</u> has been abrogated, it has not been abrogated on this point, but on how a conflict of interest is assessed.

6. Because Sedgwick's decision was not an abuse of discretion, the Court need not consider whether the benefits should be terminated for failure to comply with the requirement that Plaintiff report third-party settlements to Sedgwick, and/or calculation of the potential offsets with respect to her Social Security benefit eligibility and third-party settlement amount.

7. Further, for the same reason, the Court need not consider whether Delta did not act as a Plan Administrator and is therefore not a proper party defendant to an ERISA benefit claim.

8. Judgment is entered in favor of Defendants.

IT IS SO ORDERED.

Dated: April 23, 2019

_____
WILLIAM D. KELLER
UNITED STATES DISTRICT JUDGE